**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT BECKLEY**

STEVEN NICHOLAS WIMMER,

Petitioner,

v.

CIVIL ACTION NO. 5:26-cv-00021
CRIMINAL ACTION NO. 5:23-cr-00134

UNITED STATES OF AMERICA,

Respondent.

**MEMORANDUM OPINION AND ORDER**

Pending is Movant Steven Nicholas Wimmer's Motion to Vacate, Set Aside, or Correct a Sentence, [ECF 57], filed January 9, 2026. On January 29, 2026, the government responded in opposition. [ECF 63]. On February 2, 2026, the government amended its response in opposition, [ECF 67], to which Mr. Wimmer replied on February 5, 2026. [ECF 68]. This matter is ready for adjudication.

**I.**

Mr. Wimmer's conviction arose from his involvement in the death of pre-trial detainee, Q.B., at Southern Regional Jail ("SRJ") in Raleigh County in March 2022, after a group of correctional officers, while acting in their official capacities, used unreasonable force against Q.B. and then attempted to cover-up the circumstances of Q.B.'s resulting death. [ECF 47 at 5–10]. At that time, Mr. Wimmer was employed as a correctional officer at SRJ. [ECF 15 at 11].

The incident occurred on March 1, 2022, when Mr. Wimmer responded to an officer assistance call in C-pod. [*Id.*]. The decedent, Q.B., attempted to push past a correctional officer to leave C-pod. [*Id.*]. Upon Mr. Wimmer's arrival at C-pod, he found Q.B. on the ground and the other correctional officers engaged in the use of force against Q.B. [*Id.*]. After Q.B. was restrained

and handcuffed in C-pod, he was taken to an interview room, where he remained handcuffed and restrained. [*Id.* at 11–12]. While in the interview room, the conspirators assaulted and injured Q.B. [*Id.* at 12]. Mr. Wimmer and other conspirators then moved Q.B. from the interview room to A-pod, where Q.B. was assaulted by Mr. Wimmer. [*Id.*]. Q.B. remained restrained, handcuffed, and posed no threat while in A-pod. [*Id.*]. As noted, Q.B. succumbed to his injuries.

On August 7, 2023, Mr. Wimmer signed a plea agreement in which he agreed to plead guilty and to "give signed, sworn statements and grand jury and trial testimony upon request of the United States," and "to be named as an unindicted co-conspirator and unindicted aider and abettor, as appropriate, in subsequent indictments or informations." [*Id.* at 5]. The plea agreement was subsequently filed on the public docket on November 3, 2023. [*Id.*] On November 2, 2023, Mr. Wimmer pled guilty to conspiracy to violate civil rights in violation of 18 U.S.C. § 241, as charged in Count One of the Information filed against him. [ECF 9]. Specifically, Mr. Wimmer and other SRJ correctional officers, while acting under the color of law, "willfully combined, conspired, and agreed to injure, oppress, threaten, and intimidate Q.B." by using unreasonable force, resulting in the death of Q.B. [ECF 15 at 11–12].

At sentencing, Mr. Wimmer's total offense level was 34 and criminal history category I, which combined to produce a sentencing guideline range of 151 to 188 months. [ECF 54 at 20:3–5]. Mr. Wimmer's advisory sentencing guideline range was reduced both by the statutory maximum of ten (10) years and the Court's five-level substantial assistance reduction, leaving him with an advisory guideline range of 87 to 108 months. [ECF 47 at 15–16]. On May 8, 2025, Mr. Wimmer was sentenced to 108 months in prison. [ECF 44 at 2].

In addition to Mr. Wimmer, one other defendant pled guilty pre-indictment to an Information. [ECF 63 at 2]. Six other defendants involved in the same conduct were subsequently

indicted in an eighteen-count indictment. [*Id.*]. All but one pled guilty prior to trial. [*Id.*]. The single remaining defendant proceeded to trial and was convicted on all charges. [*Id.*].

Mr. Wimmer now pursues this motion to Vacate, Set Aside, or Correct a Sentence, claiming ineffective assistance of counsel. [ECF 57]. Specifically, Mr. Wimmer asserts the Court fundamentally misunderstood his role in the death of Q.B. [*Id.* at 9]. He alleges his lawyer's failure to object, on two separate occasions, to a material factual misstatement that he held Q.B. up in the interview room while other officers beat Q.B. [*Id.* at 10]. He further asserts there is a reasonable probability that had the Court understood the true nature of his participation in the events leading to Q.B.'s death, Mr. Wimmer would have received a lower sentence. [*Id.* at 13].

On January 29, 2026, the government responded in opposition, asserting there is no indication Mr. Wimmer's counsel's performance was deficient. [ECF 63 at 13]. Specifically, Mr. Wimmer reviewed the presentence investigation report ("PSR") without indicating any inaccuracies, admitted he was directly behind Q.B. while excessive force was used against Q.B. in the interview room, and admitted he exercised unreasonable force against Q.B. before he was brought to the interview room and then again in A-pod. [*Id.* at 13–14]. Additionally, the government asserts that inasmuch as the PSR and Court's findings do not detail all the force admitted to or alleged against Mr. Wimmer, it is plausible Mr. Wimmer's counsel strategically chose not to highlight certain statements and avoid the risk of the government or the Court emphasizing Mr. Wimmer's egregious conduct. [*Id.* at 14]. The government further highlights Mr. Wimmer's counsel's success in negotiating a favorable plea deal, reducing his maximum exposure from life imprisonment to ten (10) years imprisonment, and advocating for an additional downward reduction. [*Id.* at 14–15].

**II.**

***A. Governing Standard***

To succeed on a claim for ineffective assistance of counsel, Mr. Wimmer must show (1) counsel's performance was constitutionally deficient, and (2) such deficient performance was prejudicial. *Cox v. Weber*, 102 F.4th 663, 671–72 (4th Cir. 2024) (citing *Strickland v. Washington*, 466 U.S. 668, 685 (1984)). Performance is deemed constitutionally deficient when it falls below an objective standard of reasonableness under "prevailing professional norms." *Id.* at 672 (citing *Witherspoon v. Stonebreaker*, 30 F.4th 381, 393 (4th Cir. 2022)). In evaluating counsel's conduct, the Court applies "'a strong presumption that counsel's representation was within the wide range of reasonable professional assistance in order to eliminate the distorting effects of hindsight.'" *Richardson v. Frame*, 165 F.4th 187, 192 (4th Cir. 2026) (citing *Strickland*, 466 U.S. at 689). To satisfy the first prong, Mr. Wimmer must show counsel's errors were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Cox*, 102 F.4th at 672. To satisfy the second prong, Mr. Wimmer must show "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Richardson*, 165 F.4th at 192 (citing *Strickland*, 466 U.S. at 689).

***B. Analysis***

Mr. Wimmer must show both his counsel's performance was deficient, and this deficiency resulted in prejudice. Respecting deficient performance, Mr. Wimmer offers two contentions. First, he asserts his lawyer's failure to object to a portion of the PSR misstates Mr. Wimmer's role in the assault of Q.B. [ECF 57 at 10]. The aforementioned section states as follows:

> [H]e said he was directly behind Q.B. in the interview room and that he knows the victim was hit by COs. Wimmer said CO Holdren sprayed the defendant with Oleoresin Capsicum (OC) spray. . . He saw CO Snyder punch Q.B. in the ribs with a closed fist two or three times. Wimmer said COs Holdren, Snyder, and Walters struck the victim in the head, and that Walters hit him the most. *The defendant said he held the victim up in the interview room because that was what*

*he was told to do.*

[ECF 47 ¶ 11] [ECF 57 at 10]. Mr. Wimmer asserts the placement of the final sentence indicates he held Q.B. up to *facilitate* other officers beating Q.B., when he actually held Q.B. up *after* the beating concluded to take him to his cell. [ECF 57 at 10].

Second, he challenges his lawyer's failure to object at sentencing when the Court noted Mr. Wimmer "admits to holding the victim up in the interview room while the officers continued their abuse." [*Id.* at 12] [ECF 54 at 50:25–51:1]. Mr. Wimmer contends this was unreasonable inasmuch as he (1) knew Mr. Wimmer did not hold the victim up while other officers continued their abuse, (2) was present at Mr. Wimmer's FBI interviews when Mr. Wimmer detailed the events, (3) was involved in plea negotiations, (4) knew the government did not allege Mr. Wimmer was actively involved in the events of the interview room, and (5) had an opportunity to object to the misstatement in the PSR and later to the Court's acceptance of the misstatement, but did not. [ECF 57 at 11–12].

The Court finds no showing of deficient performance significant enough to overcome "a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Richardson*, 165 F.4th at 192. Whether Mr. Wimmer held up Q.B. while he was beaten by other officers in the interview room is a little moment considering the totality of the conduct leading to Q.B.'s death. Moreover, both parties stipulated Q.B. was handcuffed and restrained at the time he was assaulted in the interview room and when he was assaulted in A-pod [ECF 15 at 12]. In both instances Q.B. was beaten while he posed no threat to officer safety. Mr. Wimmer's counsel's failure to object to the challenged PSR language or the Court's later observation regarding his role was inconsequential. His sentencing exposure was in the same applicable range regardless due to the plea agreement skillfully negotiated by his lawyer and the authorized substantial assistance reduction the lawyer urged. The sentence imposed, and

the failure of the Court to further reduce the total offense level, resulted from the horrifying conduct and outcome noted at sentencing:

> At times in a correctional setting officers need to use force, but under the circumstances here, it was entirely unwarranted and it did, frankly, approach or was right at torture of this individual who the Court has already found to be a vulnerable victim. The fact that this individual was taken to the interview room to keep this off the tape, so to speak, and just the malevolence with which the blows were struck and the other injuries occurred frankly shocks the conscience.

[ECF 54 at 50:10–18].

Moreover, to assert some material distinction between, on the one hand, holding up a handcuffed victim while they are beaten from, on the other, standing behind a handcuffed victim and watching them be beaten, does not ameliorate the otherwise active participation in an assault. Reasonable counsel may see this distinction as one of minimal consequence, especially given the assault took place in a blind spot in the prison, with no video evidence to support Mr. Wimmer's claims.

Again, Mr. Wimmer's lawyer successfully negotiated a pre-indictment plea agreement, minimizing his sentence exposure considerably, in addition to facilitating a substantial assistance reduction lessening Mr. Wimmer's exposure to a very substantial degree. Had Mr. Wimmer's counsel performed deficiently, Mr. Wimmer may be facing a sentence more adjacent to his co-conspirators: (1) Mark Holdren was sentenced to 240 months, (2) Corey Snyder was sentenced to 235 months, (3) Johnathan Walters was sentenced to 252 months, and (4) Chad Lester was sentenced to 210 months [ECF 63 at 10]. The Court was careful in its consideration of Mr. Wimmer's role and, given the totality of Mr. Wimmer's conduct combined with the favorable outcome of his plea agreement and substantial assistance reduction, Mr. Wimmer's sentence would not have been affected by his lawyer making different purely strategic choices than those Mr. Wimmer now challenges.

The same is true respecting prejudice resulting from any asserted deficiency. Though Mr. Wimmer was sentenced at the top of his advisory guideline range to 108 months, [ECF 44 at 2] [ECF 54 at 55:8], this is nonetheless 12 months fewer than his statutory maximum. [ECF 47 ¶ 60] [ECF 54 at 33:19–21]. Inasmuch as he provided substantial assistance to the Government in helping uncover the circumstances of Q.B.'s death, the Court granted the three-level substantial assistance reduction. [*Id.* at 33:13–19]. The Court declined to grant any further reduction for a number of reasons: (1) the extreme loss that has occurred and the circumstances under which the loss occurred, [*Id.* at 51:11–13], (2) the existing benefit of the substantial assistance reduction, [*Id.* at 51:19–20], and (3) the nature and circumstances of the offense, especially given Q.B. was a vulnerable victim. [*Id.* at 52:2–5].

Mr. Wimmer nonetheless asserts there is a reasonable probability that had the Court understood the true nature of his participation in the events, he would have received a lower sentence. [ECF 57 at 13]. He contends "[b]ased on the stipulation of facts contained within [the] plea agreement—and the information charged by the Government—the level of Mr. Wimmer's *active* participation in the events leading to Q.B.'s death was lower than the Court understood it to be." [*Id.*]. Mr. Wimmer believes the Court erred in finding he actively participated in beating Q.B. in both the interview room and A-pod, when, in fact, Mr. Wimmer only actively participated in the violence against Q.B. in A-pod. [*Id.*]. He draws comparisons between his sentence and that of his co-conspirators, Ashley Toney and Andrew Fleshman. [*Id.* at 14]. Ms. Toney received a sentence of 78 months in prison, and Mr. Fleshman received 100 months. [*Id.*]. Like Mr. Wimmer, Ms. Toney escorted Q.B. to the interview room, did not intervene to protect Q.B., and falsified reports to state investigators. [*Id.*]. While more involved in the coverup, Ms. Toney was absent from A-pod and did not participate in the violent acts towards Q.B. [*Id.*]. Similar to Mr. Wimmer,

Mr. Fleshman helped handcuff Q.B. at C-pod, escorted him to the interview room, was present in A-pod, failed to intervene, and falsified incident reports. [*Id.* at 14–15]. Unlike Mr. Wimmer, Mr. Fleshman actively participated in the assault on Q.B. in the interview room. [*Id.*]. He did not, however, touch Q.B. in A-pod. [*Id.*]. Mr. Fleshman was also the first to come forward regarding the incident. [Sentencing Transcript of Andrew Fleshman, 5:23-cr-00133, ECF 65 at 41:13–15, 69:10–11]. Mr. Wimmer's insistence this Court fundamentally misunderstood his role in the death of Q.B. is frankly remarkable, inasmuch as his brutal, barbaric, callous, pitiless, and sadistic actions directly contributed to the death of a vulnerable victim entrusted to the care of SRJ.

**III.**

For these reasons, the Court **DENIES** the Motion [**ECF 57**] to Vacate, Set Aside, or Correct a Sentence.

The Clerk is directed to send a copy of this written opinion and order to counsel of record and any unrepresented party.

ENTER: September 10, 2026

Frank W. Volk
Chief United States District Judge